# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**DEBRA SUTTON,**
                    **Plaintiff,**

        **v.**                                          **Case No. 05-C-1245**

**JO ANNE B. BARNHART,**
**Commissioner of the Social Security Administration,**
                    **Defendant.**

---

## DECISION AND ORDER

Plaintiff Debra Sutton applied for social security disability benefits, claiming that she was unable to work due to arthritis, fibromyalgia, seronegative spondyloarthropathy, Raynaud's Syndrome, depression and anxiety. Her claim was denied by an Administrative Law Judge ("ALJ") after a hearing, and she now seeks judicial review of the denial under 42 U.S.C. § 405(g).

## I. STANDARD OF JUDICIAL REVIEW

Under § 405(g), the district court may affirm, modify or reverse an ALJ's decision, with or without remanding the case for a rehearing. However, the scope of the court's review is limited to determining whether the ALJ's decision is supported by "substantial evidence" and consistent with applicable law. Scheck v. Barnhart, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion. Cannon v. Apfel, 213 F.3d 970, 974 (7th Cir. 2000). Thus, where conflicting evidence would allow reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ. Binion v. Chater,

108 F.3d 780, 782 (7th Cir. 1997). If the ALJ commits an error of law, however, reversal is required without regard to the volume of evidence in support of the factual findings. Id. The ALJ commits such an error if he fails to comply with the Commissioner's regulations and rulings. See Prince v. Sullivan, 933 F.2d 598, 602 (7th Cir. 1991).

## II. DISABILITY STANDARD

In order to obtain disability benefits, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Administration ("SSA") has adopted a sequential five-step test for determining whether a claimant is disabled. Under this test, the ALJ must determine: (1) whether the claimant is presently working; (2) if not, whether the claimant has a severe impairment or combination of impairments;[1] (3) if so, whether any of the claimant's impairments are listed by the SSA as being presumptively disabling;[2] (4) if not, whether the

---

[1]An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

[2]These presumptively disabling impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e. ,"the Listings"). Each Listing contains certain "criteria" the claimant must meet in order to be considered disabled. For instance, the Listings of mental impairments consist of three sets of criteria – the paragraph A criteria (a set of medical findings), paragraph B criteria (a set of impairment-related functional limitations), and paragraph C criteria (additional functional criteria applicable to certain Listings). The paragraph A criteria substantiate medically the presence of a particular mental disorder. The criteria in paragraphs B and C describe the impairment-related functional limitations that are incompatible with the ability to work. There are four broad areas in which the SSA rates the degree of functional limitation: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). The SSA rates the degree of limitation in the first three functional areas using a five-point scale: none, mild, moderate, marked and extreme. The degree of

2

claimant possesses the residual functional capacity ("RFC") to perform her past work;[3] and

(5) if not, whether the claimant is able to perform any other work in the national economy.

Young v. Barnhart, 362 F.3d 995, 1000 (7th Cir. 2004). An affirmative answer at any step

leads either to the next step, or, at steps three and five, to a finding that the claimant is

disabled. A negative answer at any point, other than step three, ends the inquiry and leads

to a determination that the claimant is not disabled. The claimant carries the burden at steps

one through four, but if she reaches step five, the burden shifts to the SSA to establish that

she is capable of performing other work in the national economy. Zurawski v. Halter, 245

F.3d 881, 886 (7th Cir. 2001).

### III. FACTS AND BACKGROUND

**A.      Plaintiff's Application and Administrative Decisions**

Plaintiff applied for benefits on October 18, 2002, alleging that she had been disabled

since August 1, 2002. (Tr. at 141.) She wrote that she was prevented from working due to

---

limitation in the fourth area is evaluated using a four-point scale: none, one or two, three, and four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity. § 404.1520a(c)(4). Certain Listings may also be met if the claimant has marked limitations in two areas. See, e.g., 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(B).

[3]RFC is an assessment of the claimant's ability to perform sustained work-related physical and mental activities in light of her impairments. SSR 96-8p. Physical RFC includes exertional (e.g., lifting/carrying, standing/walking, sitting/standing, pushing/pulling), postural (e.g., climbing, balancing, stooping, kneeling, crouching, crawling), manipulative (e.g., reaching, handling, fingering), visual (e.g., acuity, depth perception), communicative (e.g., hearing, speaking), and environmental (e.g., tolerance of cold and heat, fumes and dust, and hazards) limitations. (Tr. at 349-52.) Mental RFC includes the ability to understand, carry out and remember instructions, and to respond appropriately to supervision, coworkers and customary work pressures in a work setting. Wates v. Barnhart, 274 F. Supp. 2d 1024, 1036-37 (E.D. Wis. 2003) (citing SSR 85-16; 20 C.F.R. § 404.1545(c)).

Case 2:05-cv-01245-LA   Filed 06/19/06   Page 3 of 30   Document 18

arthritis, fibromyalgia,[4] seronegative spondyloarthropathy[5] and Raynaud's Syndrome.[6] (Tr. at 161.) She stated that her conditions caused pain and limited her ability to move and lift, and her medications made her drowsy and dizzy. (Tr. at 161.)

Plaintiff's claim was denied initially in February 2003 (Tr. at 111; 115) and on reconsideration in June 2003 (Tr. at 113; 120). Plaintiff requested a hearing (Tr. at 124), and on January 26, 2005 she appeared before ALJ Arthur Schneider (Tr. at 57). Plaintiff, a medical expert ("ME") and a vocational expert ("VE") testified.

**B.     The Hearing**

    **1.     Plaintiff's Testimony**

Plaintiff testified that she was 33 years old, 5'11" tall and weighed 193 pounds,[7] with a 10th grade education. (Tr. at 62.) She indicated that she worked part-time (three days per week, six hours per day) as an usher and ticket taker at a movie theater. (Tr. at 68.) She stated that she had previously worked as a drywall assistant (Tr. at 62) and a telemarketer (Tr. at 79; 91).

Plaintiff testified that she had been diagnosed with seronegative spondyloarthropathy, which caused back pain (Tr. at 63-64); fibromyalgia, which produced chronic pain

---

[4]Fibromyalgia is a "syndrome of chronic pain of musculoskeletal origin but uncertain cause." Stedman's Medical Dictionary 671 (27th ed. 2000).

[5]Seronegative spondyloarthropathy is a type of rheumatoid arthritis of the vertebrae. Stedman's Medical Dictionary 1623, 1678 (27th ed. 2000).

[6]Raynaud's Syndrome is a discoloration of the fingers caused by cold or emotion. Stedman's Medical Dictionary 441, 1765 (27th ed. 2000).

[7]Plaintiff testified that her weight was 240 two months before the hearing, but she lost the desire to eat after her fiancé died suddenly of a heart attack. (Tr. at 69.)

4

throughout the body and interrupted her sleep (Tr. at 64); and Raynaud's Syndrome, which produced pain and discoloration in her hands and feet, and required her to avoid cold, vibrating tools and repetitive motions (Tr. at 65). She stated that she also had degenerative disc disease in the middle and lower back, and synovitis[8] in the ankles, which caused swelling and pain and made walking difficult. (Tr. at 66.)

Plaintiff testified that she could stand for about ½ hour before she had to sit or lie down to rest her back, legs and ankles. She stated that her manager at the movie theater accommodated her restrictions, allowing her to take breaks. (Tr. at 67.) She testified that there were days when she could not get out of bed due to pain. (Tr. at 69.) She also testified that she experienced panic attacks at least once per day, where she started sweating, had trouble breathing and felt dizzy. (Tr. at 68; 70.) She stated that she had suicidal thoughts once per month, difficulty concentrating, and crying spells several times per week. (Tr. at 70.) Plaintiff took various medications for depression, sleep aid and pain, which caused side effects of drowsiness, dizziness, fatigue, dry mouth and constipation. (Tr. at 71-72.)

Plaintiff testified that on a typical day she watched TV, read and slept. When the weather permitted, she took short walks. (Tr. at 72.) She stated that she did little housework, occasionally vacuuming and doing dishes, with breaks. (Tr. at 73.)

Plaintiff testified that she would not be able to return to any of her past jobs. (Tr. at 79-82.) Specifically, she stated that she could not physically endure the sitting or mentally handle all the hang-ups involved with the telemarketing job. (Tr. at 80.) She also stated that

---

[8]Synovitis is inflammation of a joint. Stedman's Medical Dictionary 1773 (27th ed. 2000).

she would have a hard time learning and remembering instructions in a new job, and that she had trouble dealing with the public. (Tr. at 83.)

### 2. Medical Expert Testimony

The ME, Dr. Larry Larrabee, a clinical psychologist, evaluated plaintiff's mental condition under Listing 12.04, based on an adjustment disorder with anxiety and depression, and Listing 12.06, based on anxiety and depression. (Tr. at 98-101.) Under the B criteria, he opined that plaintiff had moderate restrictions of activities of daily living, maintaining social functioning, and maintaining concentration, with one or two episodes of decompensation. (Tr. at 101.) Regarding plaintiff's mental RFC, Dr. Larrabee found that plaintiff would have no restrictions on her ability to understand and remember short and simple instructions, but would be moderately limited in her ability to understand and remember detailed instructions. (Tr. at 102-03.)

### 3. Vocational Expert Testimony

The VE, Karl Botterbusch, testified that plaintiff had an unskilled work history, with the physical demands of her jobs ranging from sedentary (the telemarketing job) to heavy, with no transferrable skills. (Tr. at 106.) The ALJ asked the VE to assume a person of plaintiff's age, education and experience, capable of lifting 10 pounds, standing two and sitting six out of eight hours, limited to simple, routine, repetitive, low stress work. (Tr. at 106.) The VE testified that such a person could perform plaintiff's past work as a telemarketer. The person could also perform other jobs such as surveillance system monitor and order clerk. (Tr. at 107.) If the person could sit and stand for a maximum of six hours in an eight hour day, she could not perform any full-time work. (Tr. at 107-08.) If the person had to lay down

6

for several hours during the course of the day, again no full-time work could be done.  If the person were absent three times per month, employment also could not be sustained.  (Tr. at 108.)  If the person would have to change positions from standing to sitting to walking every 20 minutes, none of the specific jobs the VE mentioned could be done.  (Tr. at 109.)

## C.  Medical Evidence

### 1.  Treating Medical Providers

#### a.  Physical Impairments

The medical records begin in September 1996, when plaintiff was seen by a physical therapist at the Reedsburg Area Medical Center.  Plaintiff indicated that she had been diagnosed with fibromyalgia, Raynaud's Syndrome and degenerative disc disease of the low back, and had been treated for a stress fracture of the left foot and had a synovectomy[9] of the left ankle.  She reported taking Prozac for depression, Lorapaza for stress and panic disorder, Trazodone for fibromyalgia, and anti-inflammatories.  (Tr. at 272.)  She complained of back and knee pain, and pins and needles in her hands.  (Tr. at 272-73.)  The therapist noted several trigger points indicative of fibromyalgia.  (Tr. at 274-75.)  The therapist's assessment was that plaintiff had numerous medical problems and overall poor conditioning, poor posture and body mechanics, diminished sensation, decreased cervical side bending and overall decreased strength.  Plaintiff had significant pain complaints and had not worked in over two years.  (Tr. at 275.)

Plaintiff also underwent a functional capacity evaluation at that time, which revealed that she could lift and carry about 10 pounds, stand up to 1/3 of the day and sit or walk up

---

[9]"Excision of a portion or all of the synovial membrane of a joint."  <u>Stedman's Medical Dictionary</u> 1773 (27th ed. 2000).

7

to 2/3 of the day, could not bend, squat, kneel or crawl, could use arm and foot controls and use her hands for simple grasping. (Tr. at 282.) Plaintiff was noted to have extremely low upper body strength, to use poor body mechanics to compensate for leg weakness, and to test high for depression. Her functional ability was low with a high pain profile. The evaluator noted that plaintiff may benefit from physical therapy for treatment of weakness and fibromyalgia education. (Tr. at 283.)

On October 10, 1996, Dr. Michael Schonfeld completed a medical examination and capacity form, in which he indicated that plaintiff had fibromyalgia and a possible stress fracture of the left foot. He stated that her condition was chronic but not life threatening. (Tr. at 286.) He referred to the functional capacity evaluation for her physical abilities, and noted that she was totally restricted from exposure to changes in temperature and humidity, moderately limited by the side effects of medication, and mildly limited in being around moving machinery, driving, and exposure to dust, fumes and gases. (Tr. at 286.) Mentally, he indicated that plaintiff was limited by stresses and pressures, repetitive operations, and frustration tolerance. (Tr. at 286.)

The medical records then skip to December 3, 2001, when plaintiff saw rheumatologist Dr. Jon Arnason, who indicated that plaintiff suffered from seronegative spondyloarthropathy and chronic low back pain. He provided Mobic and Oxycodone. (Tr. at 310.) Plaintiff returned to Dr. Arnason on January 7, 2002, and he noted that she was doing reasonably well on Mobic. He continued her medications but encouraged her to reduce her use of Oxycodone. (Tr. at 309.) On February 2, Dr. Arnason noted that plaintiff was doing better with the exception of right knee pain (Tr. at 307), and on February 18 he injected her right knee (Tr. at 308). On March 4, Dr. Arnason noted that the right knee was

8

better, and he continued her medication.[10]  (Tr. at 306.)  On June 3, Dr. Arnason noted that plaintiff was worse, with intermittent pain in her hands, knees and elbows, and swelling of her knees and hands.  Dr. Arnason added a new medication.  (Tr. at 303.)  On June 20, plaintiff returned sooner than expected due to increased pain all over.  Dr. Arnason scheduled a total body bone scan to see if she had synovitis.  (Tr. at 302.)  The scan was completed on June 26 (Tr. at 301) and revealed increased uptake in several joints, including her left ankle.  Though this was rather nonspecific, Dr. Arnason regarded it as confirmation of inflammatory arthritis, most likely seronegative spondyloarthropathy.  He recommended Methotrexate and folic acid.  (Tr. at 300.)  On August 5, Dr. Arnason noted that the Methotrexate was working but had to be discontinued when plaintiff developed  a sore throat.  (Tr. at 297.)  Plaintiff returned to Dr. Arnason on October 17 and was doing somewhat better.  (Tr. at 295.)

On November 20, 2002, Dr. Arnason completed a report in which he indicated that plaintiff could lift up to 20 pounds, 10 pounds frequently, stand/walk and sit at least two hours in an eight hour day, and use her hands in an unlimited manner.  (Tr. at 405-06.)  He indicated that her medications caused drowsiness, but he did not list any cognitive limitations.  (Tr. at 406.)

During this time period, plaintiff's primary physician was Dr. M. Esmaili, who saw and treated her for sinus infections, small lumps on her elbows (likely small lipomas without clinical significance), menstrual spotting, sore throat, fever, toe pain and arrhythmia in 2002.

---

[10]On April 30, 2002, Dr. William Niedermeier evaluated plaintiff's right knee.  (Tr. at 293)  An x-ray was normal (Tr. at 292), but the doctor suspected a tear of the lateral meniscus and ordered an MRI, planning to see her thereafter.  (Tr. at 293.)

9

(Tr. at 314; 316-26.) Dr. Esmaili obtained an EKG related to the last condition, which showed significant sinus arrhythmia, and he referred her to a cardiologist. (Tr. at 316.) On December 3, 2002, plaintiff reported a head tremor, and Dr. Esmaili referred her for a neurology consultation.[11] He also refilled her prescriptions, as Dr. Arnason had left the area. (Tr. at 313-14.)

Records from Adams County Memorial Hospital report that plaintiff was seen for knee pain on November 30 and December 6, 2002, and for a refill of Oxycodone. (Tr. at 328-34.) On December 19, 2002, plaintiff was assessed with hammertoe and scheduled for surgery (Tr. at 403), which was performed by Dr. Richard Langen on January 30, 2003 (Tr. at 401-02). She returned on February 6 and, aside from some pain and swelling, was doing well. (Tr. at 400.) By February 13, she was doing quite well with no complaints and good healing. (Tr. at 399.) On March 1, plaintiff was seen at the Adams ER complaining of arm numbness. While in the ER the numbness resolved, and the doctor could not determine its etiology. She was instructed to follow up with her primary care physicians if symptoms persisted. (Tr. at 390-93.)

Plaintiff began seeing Dr. Daniel Malone, her new rheumatologist, in March 2003, and he continued her on analgesics. (Tr. at 344; 347.) On March 7, 2003, Dr. Malone wrote a letter to Dr. Esmaili, stating that while Dr. Arnason raised the question of possible seronegative spondyloarthropathy, there was very little in the tests to support this diagnosis. On examination, plaintiff's joints were normal, but she did display 13 of 18 tender points for

---

[11]The consult, completed by Dr. Lotz on January 15, 2003, revealed a familial essential tremor, which could be treated with medication. However, plaintiff only wanted a firm diagnosis and declined medications. (Tr. at 384.)

10

fibromyalgia. Dr. Malone also concluded that plaintiff probably had osteoarthritis in her knees and ordered MRIs of her right hand and knee to determine whether she had active synovitis. (Tr. at 407.) A March 26 X-ray of plaintiff's right knee revealed minimal narrowing of the medial joint compartment but was otherwise negative. An MRI revealed thickening and some edema of the femoral attachment of the anterior cruciate ligament consistent with a partial tear but was otherwise negative. (Tr. at 386.) X-rays of plaintiff's hands taken on the same date were negative, and an MRI of the right hand revealed mild synovitis of the fourth finger but was otherwise negative. (Tr. at 387.)

Plaintiff began receiving her primary care at the University of Wisconsin in April 2003. In his initial note, Dr. John McCartney, internal medicine, indicated that his plan was to work on sleep maintenance and pain control, and he started plaintiff on Amitriptyline. (Tr. at 362-63.) By this time, plaintiff had applied for social security, and Dr. McCartney supported "her notion for disability given the complicated pattern of her pain syndrome." (Tr. at 363.) On May 30, 2003, Dr. McCartney noted that plaintiff did not tolerate the Amitriptyline but continued her on Oxycodone. Dr. McCartney continued to believe that poor sleep contributed to her pain syndrome and prescribed Trazodone. (Tr. at 360.) On June 25, plaintiff reported sleeping better with Trazodone but experienced hangover-type effects. Her pain was moderately controlled with Oxycodone. Dr. McCartney reduced her Trazodone dose and continued her other medications. (Tr. at 359.) Her medications were again continued in July, and she was provided with Vioxx in September based on an report of worsening back pain. (Tr. at 358.)

On September 29, 2003, plaintiff was evaluated by Dr. Kenneth Oh at the Divine Savior Physical Medicine and Rehabilitation Clinic on referral from Dr. McCartney. (Tr. at

444.) Plaintiff complained of long-standing low back pain radiating into the buttocks and posterior thigh areas. She reported being diagnosed with seronegative spondyloarthropathy, but Dr. Oh had no documentation to confirm the diagnosis. Dr. Oh believed that plaintiff's pain in the posterior thighs may be referred from the sacroiliac joint but could also be radiculopathy. He also believed, based on plaintiff's report of leg fatigue and collapse, that there could be neurologic compromise or possible myopathy. However, his neurologic exam of plaintiff's legs was relatively normal with the exception of decreased light touch sensation over the left ankle. (Tr. at 447.) Dr. Oh recommended that if plaintiff truly had seronegative spondyloarthropathy she be re-evaluated by a rheumatologist and placed on an anti-rheumatic drug. Her report of adverse reactions to numerous analgesics raised the concern of possible symptom magnification, and Dr. Oh thought it best that she be placed on a long-acting narcotic. He also recommended physical therapy for general muscle conditioning and strengthening to decrease load on joints. He declined to prescribe any medication without review of her medical records and scheduled a follow-up in one month. (Tr. at 448.)

On October 17, Dr. McCartney wrote a letter indicating that plaintiff had spondyloarthritis and a likely diagnosis of fibromaylgia, which caused chronic pain. He stated that he supported her "decision to pursue disability due to her inability to work due to chronic pain." (Tr. at 380.) He stated that she had marked discomfort and muscle aches, with increased pain and fatigue with activity. He wrote that she was unable to complete vocational rehab to any successful end point where she could be gainfully employed. (Tr. at 380.)

On October 20, plaintiff returned to Dr. McCartney, who listed her diagnoses as fibromyalgia, depression and spondylo-negative, spondyloarthropathy. Plaintiff reported

12

poor pain control and was using more Oxydocone, but reported feeling better with Wellbutrin. Dr. McCartney continued the medications. (Tr. at 437.)

Plaintiff next saw Dr. McCartney on January 12, 2004 and was distraught because her daughter had apparently run away. (Tr. at 436.) On February 12, Dr. McCartney noted that plaintiff had a history of seronegative spondyloarthropathy versus fibromyalgia with a fairly negative work-up in the past for any inflammatory disorders. She had been seeing rehab off and on, but had been fairly non-compliant with physical therapy. At that time, Dr. McCartney felt that fibromyalgia was her primary diagnosis and recommended that she get into a fibromyalgia support group, as well as pursue some hydro-therapy. Plaintiff reported improved mood with use of Wellbutrin. (Tr. at 435.)

Plaintiff returned to Dr. Oh on February 13, 2004, and he noted that she had not kept her physical therapy appointment or her follow-up appointment with him on October 27, 2003. Plaintiff continued to report some pain and was there to have a functional capacity form filled out for her social security disability claim. Dr. Oh still had not received plaintiff's medical records, and it appears that he did not complete the form.[12] (Tr. at 443.)

On March 5, 2004, Dr. McCartney completed an RFC questionnaire, indicating that plaintiff suffered from fibromyalgia, degerenative disc disease, spondyloathropathy and carpal tunnel, and that these conditions could reasonably be expected to produce her pain and functional limitations. (Tr. at 409-10.) He opined that she could continuously sit for 30 minutes before she had to stand or lie down, and continuously stand for 30 minutes. He stated that she could walk less than two blocks without rest or severe pain, could sit for four

---

[12]It appears that the second page of Dr. Oh's February 13, 2004 note is not in the administrative record.

13

hours and stand for four hours in an eight hour workday, but could not get through an eight hour day without lying down for about four hours.  He stated that she could lift no more than 10 pounds and could not reach overhead due to pain in her shoulder.  (Tr. at 410-11.)  She could bend and twist occasionally and would be absent about twice per month due to her impairments.  (Tr. at 412.)

On June 1, plaintiff returned to Dr. McCartney complaining of increased pain, difficulty sleeping and low energy.  Dr. McCartney continued her medications and strongly suggested an exercise program.  (Tr. at 433.)  On June 23, plaintiff returned complaining of continued pain and fatigue.  Her medications were continued, but Dr. McCartney discussed switching to a long acting pain medication.  (Tr. at 432.)  On August 2, Dr. McCartney noted that plaintiff had a very difficult month and had been calling the office multiple times with complaints of pain.   He switched her to Kadian, a long-acting morphine, which controlled her pain but lowered her energy level.  (Tr. at 430.)  Dr. McCartney stated that they had avoided switching to long acting opioids in the past, but given plaintiff's marked symptoms during the past month "we have crossed the line to long term opioids."  (Tr. at 431.)  He stated that he would consult the Pain Clinic for their evaluation and in the interim continue with Kadian and Oxycodone, and start with MiraLax daily.  (Tr. at 431.)  On August 30, plaintiff reported tolerating the Kadian well and stated that  she had used less Oxycodone. Dr. McCartney continued the Kadian but increased the dose.  (Tr. at 429.)

On September 17, 2004, plaintiff was seen at the Mauston Clinic for chronic sinusitis, and  Dr. Elizabeth Sisk recommended surgery.  (Tr. at 438-39.)  On September 30, plaintiff saw Dr. McCartney for a pre-operative evaluation before her sinus surgery with Dr. Sisk.

14

Plaintiff was doing quite a bit better, had lost 12 pounds and was working out daily. (Tr. at 428.)

**b.    Mental Impairments**

On July 22, 2004, plaintiff was evaluated by Dr. Randall Cullen of the Adams County Department of Community Programs, who diagnosed her with adjustment disorder with anxiety and depressed mood and a GAF of 62,[13] and referred her to therapist Claudia Manning. (Tr. at 414-19.) In her August 5, 2005 note, Manning reported that on some days plaintiff's pain was too severe to get out of bed, while on others she felt better and could garden, swim and ride her horse. (Tr. at 426.) On August 26, plaintiff reported feeling better but stated that she felt anxious while driving and when home alone. (Tr. at 425.) On September 9, plaintiff reported losing 15 pounds and feeling much better, with more energy and increased self-esteem. She still felt anxious when alone at home and worried about her child in school, though she knew it was irrational. Plaintiff wondered what she would do when her daughter graduated in a year and talked about going back to school for an EMT certification program if her disability did not go through. (Tr. at 424.) On September 30, plaintiff saw Dr. Cullen, who prescribed Wellbutrin and Geodon. (Tr. at 423.) On October 1, plaintiff called to advise that she had an EKG, which revealed that the resting period between heart beats was too long. Her Geodon was apparently tapered off and discontinued as a result. (Tr. at 422.) On October 4, plaintiff called to express concern about being taken off Geodon because she felt anxious. (Tr. at 421.) On October 25,

---

[13]GAF ("Global Assessment of Functioning") is an assessment of the person's overall level of functioning. Set up on a 0-100 scale, a score of 62 denotes mild symptoms or some difficulty in social, occupational or school functioning. Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000).

plaintiff told Manning that she felt depressed over the past month. She had been taken off Geodon until Dr. Cullen was sure her heart was not being affected, then placed back on the drug at a reduced dose. Manning and plaintiff brainstormed some things she could do to feel she had a purpose. (Tr. at 420.)

On November 17, 2004, Manning completed a mental impairment questionnaire, stating that plaintiff had an adjustment disorder with anxiety and depressed mood and a current GAF of 48.[14] (Tr. at 454.) She indicated that plaintiff suffered from appetite disturbance, decreased energy, feelings of guilt, persistent anxiety, difficulty thinking and concentrating, irrational fear of driving, sleep disturbance, recurrent panic attacks, and a history of physical symptoms that required frequent use of medication and altered her life pattern significantly. (Tr. at 455.) Under the B criteria, Manning opined that plaintiff had marked limitations in activities of daily living; maintaining social functioning; and concentration, persistence and pace; and three episodes of decompensation (as reported by plaintiff). (Tr. at 458.) However, in the section of the report pertaining to mental abilities needed to do unskilled work, Manning found that plaintiff was "unlimited" or "limited but satisfactory" in every category but one – ability to deal with normal work stress. (Tr. at 456.) Manning opined that plaintiff would be absent about three days per month due to her impairments. (Tr. at 459.) Dr. McCartney later reviewed and stated that he agreed with Manning's assessment. (Tr. at 466.)

---

[14]This score denotes serious symptoms or serious impairment in social, occupational or school functioning. DSM-IV at 32-34.

16

## 2.  SSA Consultants

Plaintiff was also evaluated by several SSA consultants.  On February 19, 2003, Dr. Robert Callear completed a physical RFC assessment, opining that plaintiff could lift 10 pounds occasionally and less than 10 pounds frequently, stand/walk two hours out of an eight hour day, sit about six hours in an eight hour workday, and push/pull in unlimited fashion.  (Tr. at 349.)  He found no postural limitations, but limited her to frequent (not constant) fine fingering and exposure to hazards.  (Tr. at 350-52.)  The assessment was reviewed and approved by Dr. Dar Muceno on June 10, 2003.  (Tr. at 355.)  On June 11, 2003, Anthony Matkom, Ph.D., completed a Psychiatric Review Technique form for the SSA, opining that plaintiff had no medically determinable mental impairment.  (Tr. at 365.)

## D.  ALJ's Decision

On February 25, 2005, the ALJ issued an unfavorable decision.  The ALJ first expressed doubt that plaintiff had any medically determinable physical impairment and accordingly found that her subjective complaints of disabling pain lacked a reasonable medical basis and were not credible.  However, the ALJ ultimately accepted the findings of the SSA consultants that plaintiff had a severe musculoskeletal impairment and was limited to sedentary work.  (Tr. at 26.)

The ALJ also questioned plaintiff's mental impairment and rejected Manning's report as internally inconsistent and contrary to the report of the SSA reviewer, who found no medically determinable mental impairment.  Relying on the testimony of the ME, the ALJ ultimately concluded that plaintiff had affective and anxiety disorders, but they imposed only moderate limitations and were not of Listing level. (Tr. at 27.)

17

The ALJ then concluded that plaintiff retained the RFC for simple, routine, repetitive, low stress work, which would not require that she lift more than ten pounds or that she stand for more than two hours or sit for more than six hours in an eight hour day. Given this RFC and relying on the VE's testimony, the ALJ concluded that plaintiff could perform her past work as a telemarketer. (Tr. at 27.) He further noted that even if she could not return to her past work, there were a significant number of other jobs she could perform as identified by the VE, such as surveillance systems monitor and order clerk. (Tr. at 27-28.) Therefore, he found her not disabled and denied the claim. (Tr. at 28.)

Plaintiff sought review by the Appeals Council, but on August 26, 2005, the Council denied her request. (Tr. at 11.)

## IV. DISCUSSION

Plaintiff argues that the ALJ (1) ignored favorable medical evidence and "played doctor," causing him to improperly reject her subjective pain complaints; (2) failed to properly evaluate her mental impairments and factor them into the RFC; (3) posed an incomplete hypothetical question to the VE; and (4) erred in finding that she could perform her past work.

### A. Disregarding Medical Evidence and Ignoring Pain Complaints

#### 1. Legal Standard

Although the ALJ need not comment in writing on every piece of evidence in the record, he may not simply ignore evidence that is contrary to his decision. Golembiewski v. Barnhart, 322 F.3d 912, 917 (7th Cir. 2003); see also Smith v. Apfel, 231 F.3d 433, 438 (7th Cir. 2000) (stating that the ALJ may not select and discuss only

18

the evidence favoring his conclusion).  Further, although the ALJ is the judge of credibility and it is his job to weigh the evidence, he may not "play doctor" and make his own independent medical findings in support of his conclusions.  Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996).  Finally, in evaluating the claimant's testimony about pain or other symptoms, the ALJ must follow the two step-step procedure outlined in SSR 96-7p.  Brindisi v. Barnhart, 315 F.3d 783, 787 (7th Cir. 2003).  Under this Ruling, the ALJ must first consider whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms.  If not, then the symptoms cannot be found to affect the claimant's ability to work.  SSR 96-7p.  If so, the ALJ must at step two determine the extent to which the symptoms limit the claimant's ability to work.  If the claimant's statements about the effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the claimant's statements based on the entire record.  SSR 96-7p.  He "may not disregard subjective complaints merely because they are not fully supported by objective medical evidence."  Knight v. Chater, 55 F.3d 309, 314 (7th Cir. 1995).  Rather, this is but one factor to consider, along with the claimant's daily activities; the location, duration, frequency and intensity of the claimant's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of medication; treatment, other than medication, the claimant receives; any measures other than treatment the claimant employs; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  SSR 96-7p.

19

### 2.    Analysis

In the present case, the ALJ began his evaluation of the evidence by questioning whether plaintiff had any medically determinable impairment that could be expected to cause pain, and whether it was even necessary to address her subjective complaints under SSR 96-7p.  (Tr. at 25.)  He then proceeded to review the evidence casting doubt on any diagnosis of spondyloarthropathy.[15]  (Tr. at 25-26.)  However, the ALJ failed to discuss whether plaintiff's allegedly disabling pain might reasonably be caused by fibromyalgia (with which she had been diagnosed on numerous occasions)[16] or even whether she had the disease.  The Seventh Circuit has recognized that "[f]ibromyalgia is a syndrome involving chronic widespread and diffuse pain throughout the entire body, frequently associated with fatigue, stiffness, skin tenderness, and fragmented sleep," Estok v. Apfel, 152 F.3d 636, 637 n.1 (7th Cir. 1998), which can be disabling, Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996).  Nor did the ALJ discuss the effects of plaintiff's obesity, despite the fact that she was

_____

[15]Although there is a basis in the medical record for rejecting this diagnosis (see, e.g., Tr. at 407; 435), the ALJ's finding was nevertheless problematic.  First, the ALJ claimed that Dr. Oh "believed there was nothing to confirm" the diagnosis.  What Dr. Oh actually said was that he did not have access to the records confirming the diagnosis.  (Tr. at 447.)  If Dr. Oh had been provided the records, he would have seen that Dr. Arnason's July 1, 2002 note confirmed the diagnosis based on a bone scan.  (Tr. at 300.)  Further, the ALJ's rejection of the diagnosis is inconsistent with his later adoption of the consultants' report, which listed a primary diagnosis of seronegative spondyloarthropathy.  (Tr. at 26; 348.)  The court may reverse an ALJ's decision which is internally inconsistent.  See Alexander v. Barnhart, 287 F. Supp. 2d 944, 965 (E.D. Wis. 2003).  Therefore, on remand, the ALJ should take another look at this condition.

[16]For instance, Dr. Malone, a rheumatologist, found that plaintiff had 13 of 18 tender spots for the disease.  (Tr. at 407.)  See Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996) (stating that the rule of thumb is that the patient must have 11 of 18 tender points).

20

referred to as obese in the medical records. (See, e.g., Tr. at 407; 437.)[17]   SSR 02-1p

requires the ALJ to "consider the effects of obesity at several points in the five-step process,"

Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004); see also Masch v. Barnhart, 406 F.

Supp. 2d 1038, 1049-50 (E.D. Wis. 2005) (discussing the manner in which obesity must be

considered at each step), which was not done in the present case.  For instance, obesity can

interact with other conditions such as arthritis to increase the claimant's pain, Barrett v.

Barnhart, 355 F.3d 1065, 1068-69 (7th Cir. 2004), an issue the ALJ ignored.  While the ALJ

weighs the evidence, he cannot ignore evidence tipping the scale in the direction opposite

his conclusion.

      After concluding that plaintiff suffered from little more than general de-conditioning

and possible over-dependence on narcotics (and rejecting the report of Dr. McCartney on

that basis), the ALJ abruptly changed course, stating: "However, the Disability Determination

Services (DDS) accepted that the claimant was limited to sedentary work and the

undersigned therefore finds her to have a severe musculoskeletal impairment."[18]  (Tr. at 26.)

Despite grudgingly concluding that plaintiff had a physical impairment, the ALJ nevertheless

failed to evaluate the credibility of her allegations of disabling pain as required by SSR 96-

7p.  The ALJ stated: "The claimant's subjective complaints lack a reasonable medical basis

and are not credible."  (Tr. at 28 # 4.)  But SSR 96-7p requires the ALJ to give "'specific

reasons for the finding on credibility, supported by the evidence in the case record.'"

---

      [17]The ALJ noted that Dr. McCartney described plaintiff as obese (Tr. at 26) but
did not further discuss the condition.

      [18]The ALJ never specified what that impairment might be.  As noted, the
consultants' report upon which he relied listed a primary diagnosis of seronegative
spondyloarthropathy.  See n.15, supra.

21

Brindisi, 315 F.3d at 787 (quoting SSR 96-7p).  The ALJ's conclusory statement in the present case is insufficient.  Scattered remarks in the body of the decision suggest the ALJ's rationale, but "nothing in Social Security Ruling 96-7p suggests that the reasons for a credibility finding may be implied."  Golembiewski, 322 F.3d at 916.  The ALJ's notation that plaintiff was noncompliant with physical therapy,[19] that she discussed getting a job if her disability claim did not pan out,[20] and that on some days she gardened, swam and rode a horse,[21] cannot take the place of an explicit credibility determination.  Nor could the ALJ properly reject plaintiff's testimony simply because the objective medical evidence did not support her claims.    Johnson v. Barnhart, No. 05-3797, 2006 U.S. App. LEXIS 13793, at *5-6 (7th Cir. June 5, 2006) ("Even when as in this case the claimant attributes her pain to a physical rather than a psychological cause, the administrative law judge cannot disbelieve her testimony solely because it seems in excess of the 'objective' medical testimony."); see also Criner v. Barnhart, 208 F. Supp. 2d 937, 951 (N.D. Ill. 2002) ("A cause of Plaintiff's

---

[19]The ALJ failed to consider any reasons for plaintiff's non-compliance, as SSR 96-7p requires, or whether therapy could restore plaintiff's ability to work.  For instance, Dr. McCartney stated that plaintiff would be unable to complete vocational rehabilitation to any end point where she could be gainfully employed.  (Tr. at 380.)

[20]Cf. Gentle v. Barnhart, 430 F.3d 865, 867 (7th Cir. 2005) ("A person can be totally disabled for purposes of entitlement to social security benefits even if, because of an indulgent employer or circumstances of desperation, he is in fact working.").

[21]This point is specious.  Patients with fibromyalgia often have good days and bad days.  See, e.g., Alexander, 287 F. Supp. 2d at 949; Gotz v. Barnhart, 207 F. Supp. 2d 886, 889 (E.D. Wis. 2002).  It is the ALJ's job to decide whether, given the ups and downs, the claimant can nevertheless work on a regular and continuing basis.  See Gotz, 207 F. Supp. 2d at 897.  Moreover, the Seventh Circuit has repeatedly "cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home."  Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006).

disabling condition, however, is fibromyalgia, and, as discussed in <u>Sarchet</u>, in most cases, there will be no objective medical evidence indicating the presence or severity of fibromyalgia.").  Indeed, the Seventh Circuit has acknowledged that "'pain alone can be disabling, even when its existence is unsupported by objective evidence.'"  <u>Carradine v. Barnhart</u>, 360 F.3d 751, 753 (7th Cir. 2004) (quoting <u>Foote v. Chater</u>, 67 F.3d 1553, 1561 (11th Cir. 1995)).

Therefore, because the ALJ ignored the line of evidence pertaining to plaintiff's fibromyalgia and obesity, selected and discussed only the evidence supporting his conclusion, and failed to explicitly evaluate plaintiff's credibility under SSR 96-7p, his decision must be reversed and the matter remanded for further proceedings.  On remand, the ALJ must consider the combined effects of all of plaintiff's impairments, severe or not, in determining her RFC.  <u>See</u> <u>Barrett</u>, 355 F.3d at 1068-69.

**B.    Mental Impairments/RFC**

**1.    Legal Standard**

Disability claims based on mental disorders are evaluated in essentially the same manner as claims based on physical impairments. If the mental impairment is severe, the ALJ must determine whether it meets or equals any of the Listings.  If not, the ALJ must determine whether the claimant retains the mental RFC to work.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00.  The RFC assessment  "complements the functional evaluation necessary for paragraphs B and C of the listings by requiring consideration of an expanded list of work-related capacities that may be affected by mental disorders."  <u>Id.</u>  According to SSR 85-16, Residual Functional Capacity For Mental Impairments:

23

this evaluation includes consideration of the ability to understand, to carry out and remember instructions and to respond appropriately to supervision, coworkers, and customary work pressures in a work setting. Consideration of these factors, which are contained in section 12.00 of the Listing of Impairments in Appendix 1, is required for the proper evaluation of the severity of mental impairments.

SSR 85-16; see also 20 C.F.R. § 404.1545(c) (stating that the ALJ must assess the mental abilities of "understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting").

### 2.    Analysis

In the present case, the ALJ noted that while plaintiff reported taking Prozac in 1996, there was no evidence of significant mental health treatment until she began seeing Claudia Manning in July 2004. The ALJ recognized that Manning, in a report later confirmed by Dr. McCartney, opined that plaintiff had a Listing level impairment, but noted that the report was both internally inconsistent and contrary to the treatment notes.[22] He further noted that the SSA psychological consultant found no medically determinable mental impairment. The ALJ then adopted the opinion of the ME, who opined that plaintiff had a severe mental impairment but was only moderately limited under the B criteria. In view of this testimony, the ALJ found that plaintiff was capable of simple, routine, repetitive, low stress work. (Tr. at 27.)

Plaintiff's first two challenges to the ALJ's findings on her mental impairment are off base. First, she claims that the ME found that she met a Listing. He found no such thing.

---

[22]Specifically, the report was internally inconsistent in that it found no or only minimal limitations in the mental RFC portion (Tr. at 463-64), yet assigned a Listing level impairment under the B criteria (Tr. at 465). The report was also inconsistent with the records of Dr. Cullen, who found that plaintiff had normal thought processes, insight, memory, judgment and motivation, with a GAF of 62. (Tr. at 417-18.)

24

Contrary to plaintiff's claim, the ME stated that plaintiff's concentration was only <u>moderately</u>, not markedly, restricted. (Tr. at 101-02.) Second, plaintiff argues that the ALJ's finding contradicted Manning's report. But the ALJ adequately explained why he did not adopt this report. <u>See</u> <u>Knight</u>, 55 F.3d at 314 ("Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence.").[23]

Finally, plaintiff contends that the ALJ failed to perform a mental RFC assessment as required by 20 C.F.R. § 404.1520 and SSR 96-8p. The ALJ ostensibly took plaintiff's mental restrictions into account in limiting her to simple, routine, repetitive, low stress work (Tr. at 27), and the Commissioner points out that courts have accepted RFC determinations expressed in such terms, <u>see, e.g.</u>, <u>Jens v. Barnhart</u>, 347 F.3d 209, 212-13 (7th Cir. 2003); <u>Johansen v. Barnhart</u>, 314 F.3d 283, 288 (7th Cir. 2002). However, to the extent that plaintiff argues that the ALJ failed to assess her mental abilities on a function-by-function basis before expressing RFC in this fashion, and failed to consider all restrictions supported by the evidence, the matter must be remanded. <u>See</u> <u>Lechner v. Barnhart</u>, 321 F. Supp. 2d 1015, 1036 (E.D. Wis. 2004). SSR 85-15 provides: "The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." The evidence suggests that plaintiff can deal

---

[23]Moreover, Manning, a therapist, is not an acceptable medical source, <u>see</u> 20 C.F.R. § 404.1502, whose opinion is entitled to special consideration under the treating source rule, <u>see</u> <u>Tindell v. Barnhart</u>, 444 F.3d 1002, 1004 (8th Cir. 2006). In her reply brief, plaintiff incorrectly refers to the therapist as "Dr." Claudia Manning. (R. 17 at 2.) Manning is not a doctor.

25

with simple instructions (Tr. at 102), but, according to her testimony, she gets anxious dealing with people and experiences panic attacks at her part-time job at the movie theater (Tr. at 68; 75). As discussed above, the ALJ failed to adequately consider plaintiff's testimony. The ALJ must on remand consider the potential limitations mentioned in the testimony and, if appropriate, factor them into the RFC. Further, the ALJ should, in his hypothetical questions to the VE, set forth plaintiff's mental limitations and allow the VE to determine what type of work she can perform, rather than purporting to tell the VE what types of work she can perform. See Young, 362 F.3d at 1005 n.4.

**C.    Hypothetical Question**

**1.    Legal Standard**

If the ALJ relies on testimony from a vocational expert, the hypothetical question he poses to the VE must incorporate all of the claimant's limitations. Indoranto v. Barnhart, 374 F.3d 470, 474 (7th Cir. 2004). However, the ALJ need not include every limitation alleged by the claimant, only those that he reasonably finds supported by the medical evidence. Ehrhart v. Sec'y of Health & Human Servs., 969 F.2d 534, 540 (7th Cir. 1992).

**2.    Analysis**

In the present case, the ALJ's hypothetical question to the VE assumed a person capable of simple, routine, repetitive, low stress, sedentary work. (Tr. at 106.) Plaintiff first argues that the question was flawed because it did not include her need to take up to four hours of breaks within each workday. However, the ALJ rejected the report

26

of Dr. McCartney, which contained this limitation.[24]  Plaintiff also notes that the ALJ's hypothetical did not include her need to change positions and miss work three days per month.   In response to questions from plaintiff's counsel, the VE said that these limitations would preclude all work.  Again, though, the ALJ was not required to include these limitations in the hypothetical just because plaintiff alleged them.[25]   Finally, plaintiff argues that the ALJ failed to include any mental limitations in the hypothetical questions or the RFC.  For the reasons set forth above, the ALJ must revisit this issue after reconsidering the RFC under SSR 85-15 and SSR 96-8p, and pose questions consistent with Young, 362 F.3d at 1005 n.4.

**D.    Step Four/Past Work**

**1.    Legal Standard**

The step four analysis involves three determinations.  SSR 82-62; Blom v. Barnhart, 363 F. Supp. 2d 1041, 1057 (E.D. Wis. 2005).  First, the ALJ must determine the claimant's RFC.  Second, he must determine the physical and mental demands of the claimant's past work.  In this context, past work can mean the actual functional

---

[24]In her main brief, plaintiff does not argue that the ALJ erred in rejecting the treating source report of Dr. McCartney.  (She does so argue in reply, but arguments presented for the first time in a reply brief are waived.  Damato v. Sullivan, 945 F.2d 982, 988 n.5 (7th Cir. 1991)).  The only treating source argument plaintiff makes in her main brief concerns the ALJ's adoption of the report of Dr. Muceno, the SSA consultant, over that of her treating rheumatologists.  However, she does not specify to which treating source report she refers.  To the extent that plaintiff argues that the ALJ erred in not accepting the diagnosis of fibromyalgia made by the rheumatologists (R. 8 at 22), I agree that the matter must be remanded.  See § IV.A.2., supra.

[25]Of course, if on remand the ALJ takes a different view after engaging in the reconsideration required by this decision he will also have to revise his questions to the VE.

27

demands of the particular job that the claimant performed, or the functional demands and duties of the job as it is generally found in the national economy. Finally, the ALJ must determine whether the claimant has the ability to meet the job demands found at step two despite the mental or physical limitations found at step one. <u>Blom</u>, 363 F. Supp. 2d at 1057. At the final phase, the ALJ cannot simply describe a claimant's past job in a generic way, e.g. "sedentary" or "light," and "and conclude, on the basis of the claimant's residual capacity, that she can return to her previous work. Instead, the ALJ must list the specific physical requirements of the previous job and assess, in light of the available evidence, the claimant's ability to perform these tasks." <u>Nolen v. Sullivan</u>, 939 F.2d 516, 518 (7th Cir. 1991) (citing <u>Strittmatter v. Schweiker</u>, 729 F.2d 507, 509 (7th Cir. 1984)).

### 2.    Analysis

In the present case, the ALJ concluded that plaintiff was capable of simple, routine, repetitive, low stress work, performed at the sedentary exertional level. Given this RFC and relying on the VE's testimony, he then found that plaintiff could return to her past work as a telemarketer. (Tr. at 27.)

Plaintiff argues that the ALJ failed to specifically consider the demands of her past work as a telemarketer, either as it is generally performed or as she did it. Instead, plaintiff contends, the ALJ used a broad generic classification of the telemarketer position.

As noted, the ALJ relied on the VE in making his step four determination. (Tr. at 107.) The VE testified that, unless he stated otherwise, his testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (Tr. at 105.) The ALJ may rely on the DOT at step four to define a job as it is generally performed in the economy. SSR 82-61; <u>see also</u>

28

Brewer v. Chater, 103 F.3d 1384, 1393 (7th Cir. 1997); Anderson v. Bowen, 868 F.2d 921, 925 n.11 (7th Cir. 1989); Johnson v. Barnhart, 329 F. Supp. 2d 751, 755 (W.D. Va. 2004). However, in the present case, the VE testified that he took issue with the DOT's designation of telemarketer as a semi-skilled position, stating that he considered it unskilled based on his research and experience. (Tr. at 106.) The ALJ should have resolved the conflict between the VE and DOT, as required by SSR 00-4p,[26] but plaintiff's counsel did not press the issue at the hearing. See Donahue v. Barnhart, 279 F.3d 441, 446-47 (7th Cir. 2002) (holding that the ALJ may rely on VE testimony contrary to the DOT if the claimant does not raise the issue).

Nevertheless, the matter must be remanded for reconsideration of this issue as well. As discussed above, the ALJ failed to adequately consider plaintiff's testimony. As is pertinent to this issue, plaintiff testified that she was fired from the telemarketing job because she was not producing, and that she could not handle the sitting required of the job, nor could she mentally deal with all the hang-ups. (Tr. at 79-80.) Therefore, on remand the ALJ will have to consider whether plaintiff's statements as to her ability to perform this job are credible and, if so, reconsider his step four analysis.[27] Plaintiff may raise the conflict with the DOT on remand.

---

[26]It is unclear whether the ALJ intended "simple" as a synonym for "unskilled." According to the DOT, the telemarketer job has an SVP of 3, making it semi-skilled. It might also be questioned whether this job could reasonably be called "low stress," but that is an issue for remand.

[27]Plaintiff goes on to argue that the ALJ also erred in his fall back finding at step five. Plaintiff contends that she cannot, based on her and the ME's testimony, perform the additional jobs identified by the VE. On remand the ALJ will have to re-consider plaintiff's testimony. However, plaintiff mis-states the ME's testimony in arguing that he found that she had marked difficulties in concentration.

29

# V. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and this case is **REMANDED** for further proceedings consistent with this decision pursuant to § 405(g), sentence four.  The Clerk is directed to enter judgment accordingly.[28]

Dated at Milwaukee, Wisconsin, this 19th day of June, 2006.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

---

[28]At several points in plaintiff's main brief, counsel cites unpublished Seventh Circuit cases.  (R. 8 at 14, 18, 22, 26.)  Circuit Rule 53(b)(2)(iv) generally forbids the citation of unpublished orders.  Fed. R. App. P. 32.1 will, if and when it goes into effect on December 1, 2006, trump Circuit Rule 53.  But until that time, plaintiff's counsel is admonished that the citation of unpublished Seventh Circuit orders is forbidden in the federal courts within this circuit.